1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   CHARLOTTE GLOVER,                          No. CIV S-09-0898-CMK

12                  Plaintiff,

13          vs.                                 MEMORANDUM OPINION AND ORDER

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                    Defendant.
16   _____/

17          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

20   judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending

21   before the court are plaintiff's motion for summary judgment (Doc. 25) and defendant's cross-

22   motion for summary judgment (Doc. 27).

23                          **I.  PROCEDURAL HISTORY**

24          Plaintiff applied for social security benefits on February 14, 2006.  In the

25   application, plaintiff claims that her disability began on November 1, 2001.  In her motion,

26   Plaintiff claims that her disability is caused by a combination of fibromyalgia, chronic neck and

back pain, headaches, carpal tunnel syndrome, and depression.  Plaintiff's claim was initially

denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which

was held on December 11, 2007, before Administrative Law Judge ("ALJ") Theodore T.N.

Slocum.   In a March 21, 2008, decision, the ALJ concluded that plaintiff is not disabled based

on the following relevant findings:

> 1.   The claimant met the insured status requirements of the Social Security
>       Act through June 30, 2005.
>
> 2.   The claimant has not engaged in substantial gainful activity since
>       November 1, 2001, the alleged onset date (20 CFR 404.1520(b), 404.1571
>       *et seq.*, 416.920(b) and 404.971 *et seq.*).
>
> 3.   The claimant has the following severe combination of impairments:
>       fibromyalgia, mild carpal tunnel syndrome, and cervical and lumbar strain
>       (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments
>       that meets or medically equals one of the listed impairments in 20 CFR
>       Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
>       404.1526, 416.920(d), 416.925 and 416.926).
>
> 5.   After careful consideration of the entire record, the undersigned finds that
>       the claimant has the residual functional capacity [to] stand and walk six
>       hours in an eight-hour day, sit six hours in an eight-hour day, lift and carry
>       25 pounds frequently and 40 pounds occasionally; and frequently reaching
>       above the shoulders and frequent fine and gross motor movements (20
>       CFR 404.1567(c) and 416.967(c).
>
> 6.   The claimant is capable of performing past relevant work as a courtesy
>       clerk and film scanner (general clerk).  This work does not require the
>       performance of work-related activities precluded by the claimant's residual
>       functional capacity (20 CFR 404.1565 and 416.965).
>
> 7.   The claimant has not been under a disability, as defined in the Social
>       Security Act, from November 1, 2001 through the date of this decision (20
>       CFR 404.1520(f) and 416.920(f)).

After the Appeals Council declined review on January 27, 2009, this appeal followed.

Additional background review indicates Plaintiff had a prior application, filed on

December 9, 2002, which was denied in a hearing decision issued May 13, 2004.  In connection

with the prior application, ALJ F. Lamont Liggett determined Plaintiff had severe impairments,

including "carpal tunnel syndrome, right interosseous nerve impingement, and chronic

cervical/lumbosacral strain with mild degenerative changes . . . ." (CAR 29).  ALJ Liggett

determined Plaintiff had the residual functional capacity ("RFC") to "lift/carry 20 pounds,

stand/walk about six out of eight hours, sit about six out of eight hours, occasionally perform

postural activities, and no frequent overhead reaching with her upper extremities consistent with

a narrow range of light to sedentary work." (CAR 33).  Based on that RFC, the ALJ found

Plaintiff had the ability to perform her past relevant work.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence,

summarized below:

Treating Physician

Chiropractic Records

Plaintiff had regular chiropractic treatments from 2000 through 2007.

Medical Records

May 3, 2004:          Plaintiff seen for follow up on medication.  She reported no

change, but continued neck pain.  She was using trazodone and Vicodin.  She reported sleeping

almost too deeply with trazodone.  On examination, she had full range of motion in her neck.

Her muscle tone was okay, but she had "Sl tenderness only at occiput."  No mid-line tenderness.

She was assessed with chronic cervical pain.

July 21, 2004:          Plaintiff was seen for a follow up for pain.  She reported

decreased energy, that "older people do better than me."  She stated her pain seemed worse, her

muscles are tight.  The trazodone was helping her sleep, but did not help her tight muscles.  She

stated her pain varied; sometimes it was in her back and other times it was in her shoulders and

arms.  However, her muscles were always tight.  Heat, ice, and stretching did not help.  She felt

her pain was the main issue, and did not want to take an antidepressant.  On examination, she had

increased tone in her neck and back muscles.  She also had tender trigger points on her trapezius

ridge and in her low back.  The assessment indicates her symptoms were suggestive of

1   fibromyalgia.  The plan was to check an arthritis panel and CPK, and recheck in two months.

2   Medication was continued.

3          August 23, 2004:      Plaintiff reported her pain continued in her neck and back.

4   There were tender trigger points noted on her trapezius ridge.  The arthritis panel was negative.

5   She was assessed with fibromyalgia, and instructed to continue her medication.

6          October 25, 2004:     Plaintiff was seen for a follow up on her back and neck

7   pain.  She reported the cold weather made her symptoms worse.  Tender trigger points on her

8   back and neck were noted, with increased tone.  She was again assessed with fibromyalgia and

9   was to continue with her intermittent Vicodin.  She was also started on Mobic.

10         January 10, 2005:      Plaintiff was seen for a follow up.  She reported occasional

11  numbness on her upper lip and that the Mobic did not help her pain, bothered her stomach, and

12  lead to nausea.  Increased tone in her neck and back muscles with trigger points were observed.

13  Her range of motion was okay, as was a sensory exam of her face.  She was assessed with

14  neuropathy and fibromyalgia.

15         April 5, 2005:       Plaintiff was seen for a medication refill.  She reported her

16  pain varies, and she has good and bad days.  She was using 200 mg of trazodone at night to sleep.

17  She reported tight muscles, and being active caused more pain.  Tenderness on the trapezius

18  ridge and cervical muscles was observed.  Her muscle tone was noted as okay.  She was assessed

19  with fibromyalgia.  Her prescriptions were renewed, and she was asked to consider Cymbalta.

20         July 8, 2005:       Plaintiff reported no change in her pain, her neck was

21  burning, and her sleep was fair.  She reported waking up early even with the trazodone.  She had

22  tenderness in paracervical muscles, and increased tone in her neck and back muscles.  She was

23  assessed with chronic neck pain and fibromyalgia.  Her medication was changed to Avinza, and

24  her Vicodin was continued.  She was advised to increase her aerobic exercise and her trazodone.

25         August 11, 2005:      She was seen for follow up on medication.  She reported

26  tolerating the Avinza, which seemed to help.  She was not having much break through pain and

4

no change in the location of her pain.  Increased tone and tenderness in her neck and upper back were noted.  It was also noted that her chronic pain was under better control with the Avinza, which was continued.

September 7, 2005:    Follow up visit for medication.  Plaintiff reported the pain program was effective, but she continued to have pain and tight muscles.  She stated the Vicodin was not much help, but that she was generally doing okay.  Increased tone in neck and back muscles with tenderness at the occiput and paracervical muscles were noted.  She was assessed with chronic neck and back pain, and was continued on Avinza.

October 5, 2005:    Plaintiff reported a severe headache two weeks prior, which lasted for two days with vomiting.  She reported coping okay otherwise.  Tender upper back, trapezius ridge, and paracervical muscles were noted.  She was assessed with chronic neck and back pain.  Avinza was renewed, but Vicodin would not be renewed for another month per her pain contract.

November 4, 2005:    Follow up visit.  She reported increased pain with headache, so she took extra Avinza which did not help.  She reported she was back to her "usual" pain at the time of the visit.  She had full range of motion in her neck, but increased headache with full flexion.  She was tender at occiput times two.  She was assessed with chronic back and neck pain with headaches.  She was counseled not to overdo her narcotic pain medication, and to supplement her medication with Tylenol or ibuprofen if needed.

December 9, 2005:    Plaintiff reported her pain was still a problem, and worse in the cold weather.  A hot pulsating shower helped.  Increased tone in trapezius ridge with trigger points was noted, as well as neck with increased tone and vague tenderness.  She was assessed with fibrositis, fibromyalgia, and chronic pain.  Her medication was renewed, and she was encouraged to try to increase aerobic exercise.

January 17, 2006:    Plaintiff reported feeling worse, with good and bad days.  Slight kyphotic posture was noted, as well as tenderness on trapezius ridge and paracervical

5

muscles.  Her range of motion was okay.  She was assessed with chronic upper back pain, fibromyalgia.

February 6, 2006:       Plaintiff reported left hand tingling, which can also occur in the right.  Her pain continued about the same in her neck and back.  No Thenar muscle wasting was noted, she had a negative Tinel's sign at wrists, and negative Spurling's maneuver. Increased tone in neck and trapezius ridge with trigger points was also noted.  She was assessed with fibromyalgia and neck pain.  Her medication was renewed, and it was noted that the increase in trazodone has not helped a great deal.

February 9, 2006:       Plaintiff seen for back pain again.  She reported her hand was not bad, but wanted something done for her back pain.  "Not much fun in life."  It was noted that her x-rays and CT were negative, the nerve conduction study suggested carpal tunnel on the left, but there was no cervical pathology.  She was assessed with chronic neck, back pain.  It was also noted that Plaintiff did not tolerate NSAIDS.  She was to try a brace on her left wrist, and Lexapro was added to her medications.

March 15, 2006:       Plaintiff was seen for routine follow up.  She stopped taking the Lexapro, because it made her too crazy.  She also reported the trazodone was making her too sleepy.  She wanted carpal tunnel fixed.  She was wearing the splint, but was having some ongoing pain.  She appeared subdued and sleepy.  On examination, she had increased tone in her neck and back with trigger point on the trapezius ridge.  Her finger to nose, Romberg, and tandem gait were all okay.  She was assessed with chronic neck and back pain, chronic myalgia, and carpal tunnel syndrom.  She was advised to check on availability of an orthopedist who would take Medi-Cal.  If she was able to find one, she would get a referral.  Otherwise, she was instructed to continue wearing the splint.

April 19, 2006:       Plaintiff reported her pain was continuing, but she was coping with Avinza.  Her psychomotor activity was observed to be slow.  Increased tone in upper back and left lower back, and tenderness at occiput times two were noted.  She was assessed with

1   chronic back and neck pain.  She was provided a sample of Cymbalta to try.

2          May 19, 2006:          Plaintiff reported she had not tried the Cymbalta yet, and

3   she had no change in her pain symptoms.  Increased tone in neck and back with tenderness at

4   occiput was noted.  She was assessed with fibromyalgia and chronic pain.

5          June 16, 2006:          Plaintiff reported the Cymbalta made her feel weird.  Some

6   of her days were better, some worse, but she had woken up stiff that day.  Increased tone in neck

7   and back with tender trigger points on trapezius ridge and low back were noted.  She was

8   assessed with chronic pain and fibromyalgia.  Cymbalta was discontinued, and she was to try

9   Neurontin.

10         September 18, 2006:   Plaintiff was seen for a follow up on her medication.  She

11   reported the Neurontin made her sick.  She had been off Avinza for twenty days because her

12   Medi-Cal status was on hold.  She reported her back is stiffer, and she is not sleeping as well.  It

13   was noted that her motivation is poor, but she denied depression.  She stated sometimes her right

14   hand goes to sleep.  Increased tone in neck and upper back muscles were noted.  She had

15   negative Tinel's sign at right wrist.  She was assessed with fibromyalgia and chronic back pain.

16   Her Avinza was renewed, she was going to taper off trazodone, and was going to consider

17   Effexor or Wellbutrin.

18         October 18, 2006:     Plaintiff was seen for a follow up.  She reported she does

19   not want to use an anti-depressant.  The colder weather had not been good for her back.  She had

20   increased pain in her back with the cold.  She appeared more alert, less sedated, and her mood

21   and affect were improved.  She had tenderness at the mid cervical spine.  She was assessed with

22   chronic neck pain.  Her Avinza was renewed, and she was advised to use ibuprofen for break

23   through pain.  Decided to hold off on anti-depressant.

24         December 18, 2006:   Plaintiff reported a little worse with the colder weather, had

25   decreased energy, and was gaining weight, but denied depression.  Her affect was flat.  She had

26   increased tone in her neck and back muscles with trigger points on trapezius ridge.  Assessed

1    with fibromyalgia, chronic fatigue, weight gain.  Decision to hold off on anti-depressant, but
2    advised to consider it at next visit.

3                    January 18, 2007:      Failed appointment.

4                    January 22, 2007:      Plaintiff reported some numbness in both arms.  It switches,
5    sometimes on the left, sometimes on the right.  She also reported some numbness on the right
6    side of her face, tightness in muscles of her back, and the cold weather was bothering her.  She
7    went a few days without Avinza and noted increased pain.  She reported the use of Avinza
8    allowed her to function better.  She was observed as alert with minimal distress.  Had marked
9    increase in tone in back and neck muscles.  Her range of motion was at 80%.  She had a positive
10   Spurling's Maneuver on the left shoulder.  Her deep tendon reflex in her arms was okay, she had
11   negative Tinel's sign in wrists, negative Phalen's test, and no thenar atrophy.  She was assessed
12   with chronic back and neck pain with development of parathesia to her arms and face.  The plan
13   was to check her c-spine x-ray, and maybe an MRI of her neck.  She was advised to stay with
14   ibuprofen and Avinza.

15                   February 20, 2007:     Plaintiff reported she did not have x-rays taken, and the
16   cold seemed to make her neck pain worse.  Increased tone in neck and upper back with
17   tenderness and spasm on trapezius ridge was noted.  Her drug test was positive only for opiates.
18   She was assessed with chronic neck pain.  Her Avinza was refilled, and she was to get a c-spine
19   x-ray.

20                   Cervical x-ray was completed on February 20, 2007.  The findings were: "AP,
21   lateral, swimmer's, odontoid and oblique views were obtained.  Alignment is normal.  The disc
22   spaces are preserved.  The neural foramina are patent.  No fracture or prevertebral soft tissue
23   swelling is evident."  The impression was: "unremarkable cervical spine radiographs."

24                   March 22, 2007:       Failed appointment.

25                   June 5, 2007:         Plaintiff was seen for follow up on medication.  She
26   reported some increased pain in her neck and upper back, and that the cold weather was causing

an increase in her symptoms.  She reported using her mother's Norco and Ambian for pain as well as ibuprofen.  Plaintiff appeared clam.  Marked increased tone in upper back and neck muscles with decrease in range of motion in the neck was noted.  Her drug screen was positive for opiates only.  She was informed that if she is using her mother's medication that was a contract violation.  She was assessed with chronic back and neck pain.  Plaintiff was counseled, and had a line by line review of  a new drug contract that she signed.

Consultative Examinations

Psychiatric Evaluation, Pavitar S. Cheema, M.D.

On May 11, 2006, Plaintiff was seen for a psychiatric consultative examination. Her presenting complaint was pain and arthritis.  She reported pain in her neck, right hand and left wrist, from arthritis and carpal tunnel syndrome.  She also reported a diagnosis of fibromyalgia.  She stated the pain causes her depression because she cannot take care of even routine minor things.  She has tried trazodone for sleep and depression but it did not help.  She reported sleeping problems, feelings of hopelessness and helplessness, fatigue, low energy, anxiety and stress.  She has not received psychiatric care.  As to Plaintiff's daily living activities, she stated she was able to take care of routine chores, but her daughter and boyfriend helped with the heavy chores.

Upon examination, Plaintiff's appearance was good, insight appeared intact, her speech was logical and goal directed.  She appeared anxious, but her affect was appropriate to content of thought, and her thinking was clear.  She was alert and oriented, memory was intact. Plaintiff was diagnosed with depression, not otherwise specified, and given a current GAF of 70. The examiner found that:

> from a psychiatric point of view, she should be able to remember, understand, and carry out simple job instructions.  She should be able to perform simple repetitive tasks.  She can have mild difficulty with maintaining attention, concentration, persistence, and pace in a normal eight-hour a day job secondary to being in pain.  She can have mild difficulty with remembering, understanding, and carrying out complex job instructions.  She

9

1    should be able to deal with changes in a routine work setting.  Her
     social interactions are fair.  She can take care of routine minor
2    chores for herself.

3    (CAR 207-08).

4                    Internal Medicine Evaluation, Julian R. Espino, MD

5           On May 20, 2006, Plaintiff was seen for an internal medicine evaluation.  As part

6    of the examination, Dr. Espino reviewed Plaintiff's medical records from December 2005

7    through March 2006.  Her chief complaint was chronic neck and back pain, as well as carpal

8    tunnel syndrom, which she reported started after a car accident in the 1990s.  She stated activities

9    such as standing, walking, and sitting increased her pain with muscle tightness.  She reported

10   taking Avinza and trazodone.

11          Plaintiff was in no obvious distress or discomfort at the examination.  Her neck

12   was supple without tenderness.  Her cervical and lumbar spine range of motion were grossly

13   normal, with no paravertebral spasms, but with tenderness.  Her straight leg raising was negative.

14   Her extremities were all grossly normal; her Tinels/Phalen's signs were negative.  She was alert

15   and oriented.  Her sensory to light touch were intact bilaterally, she had normal muscle tone and

16   bulk, her strength was 5/5 throughout upper and lower extremities.  She was diagnosed with

17   chronic neck and back pain, carpal tunnel syndrome.

18          Dr. Espino found Plaintiff

19          is not restricted from sitting, standing or walking.  She can lift,
            carry, push, and pull objects from 0-10 pounds with no restrictions,
20          11-25 pounds frequently, and 26-40 pounds occasionally.  She is
            not limited from climbing, kneeling, squatting, stooping or
21          bending.  She can frequently reach above her shoulders and
            perform fine and gross motor movements.  Her visual and
22          communicative functions are normal.

23   (CAR 223).

24                    Physical Residual Functional Capacity (RFC) Assessment

25          An agency physician completed an RFC on August 24, 2006.  It was determined

26   that Plaintiff had the ability to occasionally lift and carry 40 pounds, frequently lift and carry 20

                                        10

pounds based on a fairly normal internal medicine consultative examination.  She was found to have the ability to stand and/or walk about six hours in an eight-hour day, and sit for about six hours in an eight-hour workday.  She had an unlimited ability to push and/or pull.  There were no postural, manipulative, visual, communicative or environmental limitations established.

Psychiatric Review Technique

On August 19, 2006, an agency physician also completed a psychiatric review.  It was determined that Plaintiff's affective disorder, noted as depression, NOS, is not severe.  Plaintiff had a mild degree of limitation as to her activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.  No episodes of decompensation were noted.

Hearing Testimony

Plaintiff's Testimony

Plaintiff, who was represented by an attorney, testified at the administrative hearing.  Plaintiff testified that she was 38 years old, with a high school education, and she lived with her 18 year old daughter.  She last work in November 2001 doing light maintenance for an apartment complex.  She worked there for a little over a year, but had to quit because of migraine headaches, which she had one to two times a week, muscle spasms, and numbness in her right arm up to her face.  Her symptoms were caused from a car accident in the 1990s.  Neither she nor the other driver had insurance, so she did not make a personal injury claim.

She has never had any formal mental health care, except medication for sleeping.  Her medications included Amitriptyline and Avinza.  She has been taking Avinza, a morphine-type medication, for close to a year.  She testified that a doctor Chia Chou did a bone scan in 1999, wherein they found some arthritic signs, which it was noted was two years before Plaintiff's onset date.  Also in connection with her prior application she stated she had a nerve testing done.

She stated her main problems include her neck, carpal tunnel syndrom in her left

arm, and nerve blockage in the right wrist or forearm.  The nerve blockage findings were in 2003, by a neurologist Dr. Yassa.  She stated she saw Dr. Yassa twice.  She stated the reasons why she should get Social Security Disability include trouble with muscle spasms, numbness in her right arm up to her cheek, and migraine headaches one to two times a week.  She has to lay down for at least four hours a day where it is quiet when she gets a headache.  She does not do much housework because she can't stand for one or two hours a day and cannot do a lot of bending over.  Her daughter does the housework.  The numbness in her hands makes it harder to grasp things.  She has told her doctor about these symptoms.  She also does not lift anything because when she does she has pain in her back, muscle spasms in her back and arm, and numbness in her right arm.

In response to her attorney's questioning, Plaintiff further testified that she is in constant pain, at a level of eight to ten, on a ten point scale.  Standing makes her pain worse.  She is unable to walk even one block.  Her daughter does most of the household chores, including lifting the laundry.  Side effects from her medication include drowsiness, and she normally has to take naps during the day.  If she is having a migraine, which happens once to twice a week, she has to lie down in a quiet dark room.

The numbness in her hand makes it difficult to pick up small items because she cannot feel her hand; she is always trying to wake it up.  The more she uses her hand, the more difficult it becomes because it goes numb with use.  As time passes, her symptoms are getting worse, both pain and numbness.

Vocational Expert's Testimony

The ALJ called Christopher Salvo to testify as a vocational expert (VE).  In response to the VE's questions, Plaintiff testified that she worked as a courtesy clerk at the Rainbow Market in 1993 or 1994, for about a year.  She thought she left that position due to trouble with daycare of her young child.  She also worked as a film scanner for more than 30 days within the last 15 years.  That position was with a title company where she scanned

microfilm onto a computer screen so it could be sent out.

The VE then testified that Plaintiff's past work included courtesy clerk/bagger at a grocery store (DOT code 920.687-014) which is classified as unskilled and medium as normally performed, and SVP of two.  As a packing attendant or hand packer (DOT code 920.587-018), she worked at an exertional level of medium, unskilled with an SVP of two.  Her position as film scanner was categorized as a general clerk (DOT code 209.562-010), classified as light with an SVP of three.  As to her position as apartment maintenance, as Plaintiff testified it was more janitorial in nature (DOT code 382.664-010) which is classified as semi-skilled and medium, with an SVP of three, as generally performed.  However, based on Plaintiff's testimony, that she only had limited lifting up to about five pounds, the position may have been less than medium as performed.  Plaintiff's past work provided transferable skills, such as the ability to deal with the public, light clerical duties, knowledge of cleaning components, and how to do things in a timely and effective manner.

The ALJ then asked the VE the following hypothetical question:

I want you to assume a person of the vocational profile of Charlotte Glover.  Her present age is 38.  She was 32 at the alleged onset date.  She's a high school graduate, she has the prior relevant work history and skill set as you have identified.  Assume such a person has the residual functional capacity to perform exertional work as follows; from 77F, the person can stand and walk six hours per eight-hour day, can sit six hours per eight-hour day.  And from Exhibit 93F, the hypothetical person would further be subject to the following work-related mental limitations, which are listed at 81F.  The hypothetical person would have mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, and pace, and has no episodes of decompensation. . . . Could such a hypothetical person reasonably be expected to perform any of the claimant's prior work on a competitive, sustained, regular, reliable, continuous basis?

The VE responded that such a person could perform all of the past jobs.

Plaintiff's attorney then questioned the VE, and provided another hypothetical.[1]  In addition to the above hypothetical, "I'd like you to add the following restrictions that the individual would be able to lift up to 25 pounds frequently and 40 pounds occasionally."

The VE responded that those restrictions would eliminate the janitorial and packing attendant.  Looking at the general DOT codes, as generally performed, those two positions would be eliminated.  However, the VE found there might be some positions she could return to if the lifting was limited to up to 45 pounds, 40 pounds occasionally, and 25 pounds frequently.  However, the VE found even with the additional limitations, the individual could perform the other two positions (general clerk and courtesy clerk).

Plaintiff's attorney then added additional limitations, including the need to take at least a ten-minute break every hour.  The VE stated a ten-minute break every hour would not be permissible in these type of jobs, so she would be unable to perform the past relevant work.  Requiring a ten-minute break every hour would eliminate any job in the national economy as a person is generally allowed one break in the first part of the shift, then a lunch, and a second break in the second part of the shift.

A fourth hypothetical from the attorney was posed, "dealing with the six/six limited lifting, less than a full range of medium lifting, and the mild impairments" set forth by the ALJ.  Adding to that, "the individual had a moderate impairment in regards to the ability to maintain persistence, pace, and concentration due to the medication for chronic pain . . . ."  The VE stated she would not be able to do the medium jobs, but could do the light jobs.  He stated an "assessment term of moderate, is an impairment that significantly affects but does not preclude the ability to function.  That is my definition of moderate, and it is traditionally used in many, many hearings and settings.  It does affect the person, but it does not preclude."

---

[1]     Plaintiff's attorney cited to 20F for support of these restrictions, which is Dr. Espino's consultative examination report.

1     The ALJ followed up with another hypothetical:

2     Assume the hypothetical person has the residual functional
3     capacity to perform the 20F limitations as follows.  No restrictions
      of sitting, standing, or walking.  Has the ability to lift, carry, push
      or pull objects from 0 to 10 pounds with no restrictions, 11 to 25
4     pounds frequently, and 26 to 40 pounds occasionally.  That's the
      ability to lift and carry, push and pull, at those levels.  The
5     hypothetical person is not limited from climbing, kneeling,
      squatting, stooping, or bending, and the hypothetical person can
6     frequently reach above her shoulders and perform fine and gross
      motor movements.  And the hypothetical person has normal visual
7     and communicative functions.  Bearing hypothetical five in mind,
      sir, question number one is, could such a hypothetical person
8     perform any of the claimant's prior work on a competitive,
      sustained, regular, reliable basis?

9

10    The VE responded that such a person could perform all of Plaintiff's past work,

11    noting the 26 to 40 pound limit was occasional, that it did not eliminate anything over 40 pounds,

12    and that the majority of Plaintiff's prior work would not require lifting over 40 pounds very much

13    at all.

14    Modifying the last hypothetical again, the ALJ asked if adding "the mild mental

15    restrictions that I included in my first hypothetical with respect to activities of daily living, social

16    functioning, maintaining pace, persistence and concentration, and no episodes of

17    decompensation, would your answer be any different?"

18    The VE stated: "No, it would not be any different.  Once again, mild would not

19    preclude the person from doing the work."

20    **III.  STANDARD OF REVIEW**

21    The court reviews the Commissioner's final decision to determine whether it is:

22    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

23    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

24    more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

25    (9th Cir. 1996).  It is "such evidence as a reasonable mind might accept as adequate to support a

26    conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including

15

1  both the evidence that supports and detracts from the Commissioner's conclusion, must be

2  considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v.

3  Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

4  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

5  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

6  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

7  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

8  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

9  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

10  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

11  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

12  Cir. 1988).

13                                     **IV.  DISCUSSION**

14          Plaintiff argues the ALJ erred in three ways: (1) the ALJ failed to fully develop

15  the record; (2) the ALJ failed to properly credit Plaintiff's testimony and third party statements;

16  and (3) the ALJ failed to properly assess Plaintiff's Residual Functional Capacity (RFC) and pose

17  a legally adequate hypothetical to the vocational expert.

18          **A.      Duty to Develop**

19          The duty to prove disability lies with the claimant.  See Mayes v. Massanari, 276

20  F.3d 453, 459 (9th Cir. 2001) (citing 42 U.S.C. § 423(d)(5); Clem v. Sullivan, 894 F.2d 328, 330

21  (9th Cir. 1990)).  The ALJ has an independent duty to fully and fairly develop the record and

22  assure that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144,

23  1150 (9th Cir. 2001).  However, "[a]n ALJ's duty to develop the record further is triggered only

24  when there is ambiguous evidence or when the record is inadequate to allow for proper

25  evaluation of the evidence."  Mayes, 276 F.3d at 459-60.  When the claimant is not represented

26  by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts.  See

1   id.  This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and

2   explore for all the relevant facts." Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   The ALJ

3   may discharge the duty to develop the record by subpoenaing the claimant's physicians,

4   submitting questions to the claimant's physicians, continuing the hearing, or keeping the record

5   open after the hearing to allow for supplementation of the record.  See Tonapetyan, 242 F.3d at

6   1150 (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

7           Here, Plaintiff argues that the ALJ erred by failing to include the medical records

8   from her prior application and by not recontacting her treating physician for an updated RFC.

9   Specifically, Plaintiff points to a 1999 bone scan and a 2003 EMG.  She alleges both of these

10  records were contained in her prior application.  In addition, Plaintiff argues the ALJ should have

11  contacted Dr. Klistoff, her treating physician, for an updated RFC statement as the statement in

12  her previous application was at odds with the CE's findings and the ALJ noted minimal findings

13  through treating sources.  She further argues that none of the evidence from her prior application

14  is included in her current application in order to "confirm the level of impairment and type of

15  treatment" Plaintiff had received.

16          In response, Defendant argues the 1999 bone scan and 2003 nerve conduction, or

17  EMG, study were unnecessary for the ALJ's determination.  Defendant avers that the record

18  contains other, more recent, radiological studies which support the ALJ's decision and the prior

19  ALJ found Plaintiff was not disabled even with the prior EMG.  In addition, the ALJ adequately

20  addressed Plaintiff's carpal tunnel syndrome, including assessing Plaintiff with limitations on her

21  manipulation ability to no more than frequent.  As to Dr. Klistoff's opinion, Defendant states the

22  opinion was properly rejected by the previous ALJ, and Plaintiff has not provided any evidence

23  that an updated opinion from Dr. Klistoff would have had any effect on the ALJ's determination.

24  Plaintiff had the opportunity to provide additional medical opinion evidence to the appeals

25  counsel and the court, which she failed to do.

26

1                 In his decision, the ALJ addressed the prior ALJ determination of non-disability

2   stating:

3                     If the presumption [of continuing non-disability] is rebutted
based on changed circumstances, then the adjudicator must adopt
4         certain findings from the final decision on the prior claim in
determining whether the claimant is disabled, unless the record
5         contains new and material evidence relating to such finding or
there has been a change in regulation regarding the evaluation of
6         disability.

7                     In this case, the presumption of continuing non-disability is
rebutted because the record contains evidence of a new diagnosed
8         impairment which was not contained in the previous record and
which constitute changed circumstances. Thus, although non-
9         disability cannot be presumed, each finding of the prior decision
will be reviewed to determine whether it will be adopted or
10        whether new and material evidence has been obtained in the
current claim which would support a change in the finding.
11   (CAR 16).

12                 The ALJ then addressed each of the prior findings. Specifically, the ALJ stated:

13                     In the prior decision, it was found that the claimant had
carpal tunnel, right interosseous nerve impingement, and chronic
14        cervical/lumbosacral back strain (A Section). The current record
also continues to show that [sic] the same impairments. However,
15        while the first record found that the claimant's fibromyalgia was
non-severe, the current record finds that while there is not strong
16        support for this diagnosis, there were indeed tender points as well
as her treating source's continued diagnosis of fibromyalgia.
17        Therefore, giving the claimant the benefit of the doubt, it is found
that there is new . . . and material evidence to establish this as an
18        additional severe impairment.

19   (CAR 18).

20                 The ALJ further found:

21        [t]he prior decision found that the claimant's condition did not
meet or equal the requirements of a listed impairment. The current
22        record contains no objective evidence to change this determination.
The record shows no worsening of the claimant's musculoskeletal
23        impairments. Regarding the claimant's fibromyalgia and/or
chronic fatigue syndrome, the record contains no objective
24        evidence of a degree of functional loss required by the listings.
Thus the prior determination that a listing his not met or equaled is
25        adopted.

26   (CAR 19).

1    In addition, the ALJ determined that "new and material evidence establishes that

2    the claimant's carpal tunnel syndrome has improved, and therefore the postural limits, the lifting,

3    and the more limiting upper extremity limitations are not adopted from the prior decision."

4    (CAR 20).

5    Finally, although the ALJ did not contact Dr. Klistoff for an updated statement,

6    the ALJ did focus on the medical records from Dr. Klistoff.  The ALJ noted that Plaintiff

7    continued to voice pain complaints to Dr. Klistoff, but the findings failed to support her pain

8    complaints.  Dr. Klistoff noted trigger points on occasion, but he also noted increased tone in the

9    trapezius and neck, and only vague tenderness.  The only treatment offered was renewal of

10   medication and a suggestion to increase aerobic exercise.  In addition, the examination records

11   revealed a full range of motion in the neck, no thenar muscle wasting, negative Tinel's sign at the

12   wrist and negative Spurlings maneuver.  Finally the ALJ noted that

13       [t]he current record contains essentially the same clinical findings
     as those in the prior record.  Although a diagnosis of a new
14       impairment has been considered as new and material evidence,
     there is no evidence of a change in treatment for any disorder since
15       the prior decision.  The claimant's medications remain virtually the
     same, and there is no evidence of any significant change in her
16       disorders.  The minimal findings and the very limited and
     conservative treatment do not support the extreme limitations
17       alleged by the claimant.  As in the prior decision, she continues to
     allege that she does . . . . nothing, and rests at least half the day.
18   (CAR 21).

19   The prior decision, issued May 13, 2004, by ALJ Liggett, addressed the medical

20   records, including the two Plaintiff specifically argues should have been included in the current

21   record, and the statement from Plaintiff's treating physician, Dr. Klistoff.  ALJ Liggett found the

22   1999 bone scan "showed possible degenerative change at C3."  (CAR 29).  As to the 2003 EMG,

23   ALJ Liggett found "it showed evidence of entrapment neuropathy of the right anterior

24   interosseous nerve and left-sided carpal tunnel syndrome with no suggestion of a myopathy,

25

26

plexopathy or cervical radiculopathy.  (CAR 29).  Finally, ALJ Liggett noted the presence of

> an undated, unsigned statement, [wherein] Dr. Klistoff stated the claimant has fibromyalgia and chronic back/neck pain.  He stated she did not have significant limitation of motion.  She has occipital muscle contraction headaches once or twice per week that are relieved by taking medication or lying down in a quiet place.  He stated the claimant could sit/stand/walk for four hours, sit for about four hours, and stand for about four hours.  She does not need a cane or other assistive device to stand/walk.  She can lift/carry ten pounds.  She can occasionally move her neck in most positions. (CAR 29).

In determining Plaintiff's RFC, ALJ Liggett considered the limitations noted by Dr. Klistoff, but gave the opinion little wight:

> Dr. Klistoff stated the claimant has fibromyalgia but his treating records do not support that diagnosis.  The treating records of Dr. Klistoff just show cervicitis, entrapment neuropathy of the right anterior interosseous nerve and left-sided carpal tunnel syndrome with no suggestion of a myopathy, plexopathy or cervical radiculopathy.  These findings would be consistent with the above-noted residual functional capacity of no lifting/carrying greater than 20 pounds, occasionally performing postural activities, and no frequent overhead reaching.  There is no evidence to support a diagnosis of fibromyalgia such as multiple tender points or referral to a rheumatologist.  Fibromyalgia is generally characterized by the absence of objective findings but in this case, the claimant does have objective findings noted on EMG testing and x-rays to support her pain complaints in her neck and arms but not to the extent that would support the limitations noted by Dr. Klistoff. (CAR 31).

ALJ Liggett then determined that Plaintiff's limitations are consistent with the ability to perform a narrow range of light to sedentary work, and she was therefore able to perform her past relevant work.

These findings created a presumption of continuing non-disability.  The prior determination of non-disability also creates a presumption of continuing non-disability.  See Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995).  The presumption does not apply, however, if there are changed circumstances.  See Taylor v. Heckler, 765 F.2d 872, 875 (9th Cir. 1985).  Thus, the presumption of continuing non-disability may be overcome by a showing of new facts establishing a previously unlitigated impairment.  See Lester, 81 F.3d at 827-28; see also

1    Gregory, 844 F.2d at 666.

2           ALJ Slocum found the presumption of continuing non-disability to be rebutted

3    based on evidence of a new diagnosed impairment not contained in the previous record,

4    fibromyalgia.  However, he also noted that the findings of the prior decision may still be adopted

5    if no new and material evidence was obtained to support a change in the finding.  He then found

6    new and material evidence supporting an improvement in Plaintiff's carpal tunnel, so did not

7    adopt the more limited prior findings.  In addition to the weak medical evidence to support her

8    claims, the ALJ noted the essentially normal consultative examination.  He also noted limited

9    and conservative treatment, and no change in treatment for any disorder since the prior decision.

10   He therefore found her abilities improved, and that she is capable of performing medium work,

11   and her past relevant work.  As the prior ALJ made the necessary findings related to the older

12   medical records, including the 1999 bone scan and 2003 EMG, the inclusion of those records in

13   the current file was unnecessary.

14          "An ALJ is required to recontact a doctor only if the doctor's report is ambiguous

15   or insufficient for the ALJ to make a disability determination."  Bayliss v. Barnhart, 427 F.3d

16   1211, 1217 (9th Cir. 2005) (citing 20 C.F.R. § 404.1512(e), 416.912(e); Thomas v. Barnhart, 278

17   F.3d 947, 958 (9th Cir. 2002)).  Where there is sufficient evidence in the record to make a

18   disability determination, the ALJ is not required to recontact Plaintiff's doctor.  See id.  Here,

19   there was support in the record for the ALJ's determination regarding Plaintiff's disability, and

20   the ALJ was not required to recontact Plaintiff's doctor.  To the extent the ALJ had a duty to

21   supplement the record in this case, he fulfilled that duty by ordering consulting evaluations.

22          **B.     Credibility**

23          1.     Plaintiff's Credibility

24          The Commissioner determines whether a disability applicant is credible, and the

25   court defers to the Commissioner's discretion if the Commissioner used the proper process and

26   provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

1   claimant cooperated during physical examinations or provided conflicting statements concerning

2   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

3   claimant testifies as to symptoms greater than would normally be produced by a given

4   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

5   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

6          Here, the ALJ found:

7          The claimant testified at that hearing that she cannot work
           because of migraine headaches, spasms, and numbness in her right
8          arm and face due to a car accident in the 1990's.  She said she
           takes morphine.  She said that she has neck problems and carpal
9          tunnel syndrome.  She said it causes the muscle spasms in her right
           side and numbness in her hands.  She said she lies down four hours
10         during the day.  She said that her daughter helps her with
           housework.  She said she cannot lift anything.  She said she is
11         undergoing some ANA testing.

           After considering the evidence of record, the undersigned
12         finds that the claimant's medically determinable impairments could
           reasonably be expected to produce the alleged symptoms; however,
13         the claimant's statements concerning the intensity, persistence and
           limiting effects of these symptoms are not credible to the extent
14         they are inconsistent with the residual functional capacity
           assessment for the reasons explained below.

15         The prior record found that the claimant had the residual
           functional capacity to perform a wide range of light work as
16         described above.  The clinical findings were very minimal in the
           prior record, with only interosseous nerve and left-sided carpal
17         tunnel syndrome with no suggestion of myopathy, plexopathy or
           cervical radiculopathy (A Section).

18         In terms of the claimant's alleged pain symptoms in the
           current record, again there are minimal findings through treating
19         sources. . . . While the claimant continues to voice severe pain
           complaints, Dr. Klistoff's findings have failed to support her
20         complaints.  Although he notes on occasion trigger points, as on
           December 9, 2005, when he diagnosed fibromyalgia, he also noted
21         that she had increased tone in the trapezius and neck, and there was
           vague tenderness.  His only treatment was to renew her
22         medications and told her to try increasing her aerobic exercise (24,
           45, 110).  Other negative findings were full range of neck motion
23         (109), and no thenar muscle wasting, negative Tinel's sign at the
           wrists, and negative Spurlings maneuver (54, 25, 111).  She was
24         tried on Neurontin and Trazodone without benefit.  She reported
           that pain persisted with all medications she took and Avinza only
25         helped her to cope (116).
           . . .
26         The current record contains essentially the same clinical

findings as those in the prior record.  Although a diagnosis of a new impairment has been considered as new and material evidence, there is no evidence of a change in treatment for any disorder since the prior decision.  The claimant's medications remain virtually the same, and there is no evidence of any significant change in her disorders.  The minimal findings and the very limited and conservative treatment do not support the extreme limitations alleged by the claimant.  As in the prior decision, she continues to allege that she does nothing, and rests at least half the day.

The undersigned has considered the claimant's testimony as well as third party statements (pgs 29-26) [sic].  Although the claimant described daily activities which are fairly limited in addition to debilitating pain, two factors weigh against consider[ing] theses allegations to be strong evidence in favor of finding the claimant disabled.  First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.  Secondly even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence [and] other factors discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The claimant's allegation of headache has been considered and it is noted, she has few, if any complaints of headaches to her physician.  Regarding the claimant's and the third party description of severity of the pain and allegation of extreme fatigue has also been considered.  There is no evidence to support this degree of pain or fatigue.  Her allegations are so extreme as to appear implausible, in light of the lack of clinical findings.  Further treating records do not show that she has any adverse effect from narcotic pain medication.  Although she takes pain medication, and may have fatigue and headaches, there is no evidence to establish that any of these, either singly or in combination, are experienced at a frequency or severity that would interfere with work activity.

(CAR 20-22).

Plaintiff argues the ALJ's reasoning for discrediting Plaintiff's testimony was without merit.  She states that the record documented her diagnosed fibromyalgia and her testimony as to her symptoms, such as back and neck pain, fatigue, headaches, muscle spasms, pain, numbness and tingling in her arm and face, trigger points, and tenderness, were consistent with that diagnosis.  In addition, she claims her headaches were documented by the record in that her treating physician diagnosed her with chronic headaches, which should have been included as a severe impairment.  There also were clinical findings to support her testimony, including her

1   reports of chronic fatigue, headaches, neck, back and muscle pain, trigger points and tenderness.

2   Finally, the ALJ's determination that she had no adverse effects from narcotic medication is

3   incorrect in that Dr. Klistoff reported she had tried and failed on Vicodin and Mobic.   There is

4   no evidence of malingering in the record, and the ALJ failed to articulate legitimate reasons for

5   rejecting her testimony.

6          Defendant responds that the ALJ discounted Plaintiff's testimony based on

7   objective findings.  The ALJ pointed out normal x-rays, normal physical examinations, negative

8   carpal tunnel testing, as well as treating source examinations which contradicted Plaintiff's pain

9   and numbness complaints.  In addition, the ALJ found her treatment to be conservative, which

10  also belies her complaints.  As to Plaintiff's headaches, the ALJ found an inconsistency between

11  her testimony and the statements to her doctors.  Finally, the ALJ properly discounted Plaintiff's

12  subjective statements regarding the side effects of her medications as there was no objective

13  evidence to support them.  Thus, the ALJ did not err in his determination that Plaintiff's reduced

14  daily activities were limited by her medical conduction, but rather due to other reasons.

15         As the defense points out, the ALJ determined that Plaintiff's subjective pain

16  testimony was not supported by the minimal findings, and limited and conservative treatment.

17  The undersigned agrees.  While the ALJ cannot discredit a plaintiff's testimony only because that

18  testimony is not supported by objective medical evidence, the ALJ here did more than that.[2]  The

19  ALJ considered the nature of Plaintiff's symptoms, her medication, treatment and functional

20  restrictions.  He found her pain was sufficiently controlled by her medication regimen, without

21  significant side effects, there were only minimal findings from Plaintiff's treating sources, and

22  she had only limited and conservative treatment.   As for Plaintiff's headache allegations, as the

23  ALJ found, she had few, if any, complaints of headaches to her physician.  The undersigned only

24

25         [2]     The ALJ's additional reason, that Plaintiff's limited daily activities cannot be
    objectively verified, by itself may not have been a sufficient reason for discounting Plaintiff's
26  testimony.  However, the ALJ provided additional reasons, which are supported by the record.

1  found two such complaints, in the fall of 2005, and there was no significant treatment for her

2  headaches.

3       The undersigned finds the reasons the ALJ gave for discrediting Plaintiff's

4  testimony were specific, legitimate, convincing, and supported by the record.  The consultative

5  examinations were grossly normal, and the findings of Plaintiff's treating physician were

6  minimal.  Although her treating physician noted tenderness and trigger points in Plaintiff's neck,

7  back and shoulders, her range of motion was grossly normal, she tolerated the Avinza well which

8  helped her pain, there was no referral to any specialists such as a rheumatologist, no evidence of

9  attempts to identify other causes of her pain, and she was not referred to physical therapy.  The

10  only notation of a specialist was a possible referral to an orthopedist, which apparently did not

11  occur.  Plaintiff argues the ALJ erred in determining she had no adverse effect from her

12  medication because she had tried and failed on other medication.  However, while the

13  undersigned agrees with Plaintiff that there is evidence she tried and failed on other medication,

14  such as Vicodin and Mobic, there is no indication in the record that she had any side effect from

15  Avinza, and there are indications that it sufficiently controlled her pain.  For any breakthrough

16  pain she experienced, she was instructed to use ibuprofen, and there is no indication that was

17  ineffective.  Therefore, the ALJ's reasons for discrediting Plaintiff's "extreme" and

18  "implausible" pain allegations are supported by the record, and the court will defer to the ALJ's

19  discretion.

20       2.    Witness Credibility

21       Plaintiff also argues the ALJ erred in rejecting her third party statements which

22  supported her testimony.  She essentially argues the ALJ ignored her third party statements

23  without any discussion, only stating that he had considered the statements.  Defendant responds

24  the ALJ properly rejected the third party statements as inconsistent with and uncorroborated by

25  the medical evidence.

26       In determining whether a claimant is disabled, an ALJ generally must consider lay

26

1    witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

2    919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

3    testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

4    evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

5    F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

6    of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

7    919.

8            The ALJ, however, need not discuss all evidence presented.  See Vincent on

9    Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

10   why "significant probative evidence has been rejected." Id. (citing Cotter v. Harris, 642 F.2d 700,

11   706 (3d Cir. 1981).  Applying this standard, the Ninth Circuit has held that the ALJ properly

12   ignored evidence which was neither significant nor probative, as well as evidence that is

13   controverted by the medical evidence.  See id. at 1395.

14           In Stout v. Commissioner, the Ninth Circuit considered an ALJ's silent disregard

15   of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay witness had

16   testified about the plaintiff's "inability to deal with the demands of work" due to alleged back

17   pain and mental impairments.  Id.  The witnesses, who were former co-workers testified about

18   the plaintiff's frustration with simple tasks and uncommon need for supervision.  See id.  Noting

19   that the lay witness testimony in question was "consistent with medical evidence," the court in

20   Stout concluded that the "ALJ was required to consider and comment upon the uncontradicted

21   lay testimony, as it concerned how Stout's impairments impact his ability to work."  Id. at 1053.

22   The Commissioner conceded that the ALJ's silent disregard of the lay testimony contravened

23   Ninth Circuit case law and the controlling regulations, and the Ninth Circuit rejected the

24   Commissioner's request that the error be disregarded as harmless.  See id. at 1054-55.  The court

25

26

concluded:

> Because the ALJ failed to provide any reasons for rejecting competent lay testimony, and because we conclude that error was not harmless, substantial evidence does not support the Commissioner's decision . . .

Id. at 1056-67.

From this case law, the court concludes that the rule for lay witness testimony depends on whether the testimony in question is controverted or consistent with the medical evidence. If it is controverted, then the ALJ does not err by ignoring it. See Vincent, 739 F.2d at 1395. If lay witness testimony is consistent with the medical evidence, then the ALJ must consider and comment upon it. See Stout, 454 F.3d at 1053. However, the Commissioner's regulations require the ALJ consider lay witness testimony in certain types of cases. See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13. That ruling requires the ALJ to consider third-party lay witness evidence where the plaintiff alleges pain or other symptoms that are not shown by the medical evidence. See id. Thus, in cases where the plaintiff alleges impairments, such as chronic fatigue or pain (which by their very nature do not always produce clinical medical evidence), it is impossible for the court to conclude that lay witness evidence concerning the plaintiff's abilities is necessarily controverted such that it may be properly ignored. Therefore, in these types of cases, the ALJ is required by the regulations and case law to consider lay witness evidence.

The lay witness statements at issue here are letters provided by Plaintiff's sister and friend. The letter from Plaintiff's friend, Mr. Spence, identified that Plaintiff's symptoms stem from a car accident and that she has pain in her back and neck, and numbness in her hands. He sets forth an example of Plaintiff's hands going numb. He then explains that Plaintiff has had difficulty getting medical treatment and medication. However, there is nothing in Mr. Spence's letter which addresses the amount of pain she experiences, the frequency in which she

experiences pain or numbness, or the effect the pain and numbness have on Plaintiff's ability to

do work activities.  He offers no explanation as to the effect of the pain or numbness on Plaintiff.

Plaintiff's sister's letter speaks to the difference in Plaintiff before the car accident

and after in that she used to be athletic and now has to be careful of her "hard movements"

because of her neck.  In addition, she referenced Plaintiff's headaches and numbness in hands.

As with Mr. Spence's letter, Ms. Glover does not address how Plaintiff's neck condition,

headaches, or numbness has affected her abilities.  She does, however, indicates that Plaintiff

used to have the ability to cook, and especially enjoyed cooking holiday dinners for the entire

family, but is no longer able to do so due to her inability "to stand on her foot for an extended

period of time."  (CAR 77).

The third party statements regarding plaintiff's pain and numbness are neither

significant nor probative, and the undersigned cannot find error in the ALJ's failure to discuss the

statements in detail.  The ALJ stated he considered the statements and rejected them for the same

reasons he rejected Plaintiff's statements.  While he did not set forth specific, cogent reason as to

each statement, the undersigned finds that was not necessary in this situation, especially given the

sufficiency of the reasons the ALJ provided for rejecting Plaintiff's testimony.  The only possible

exception to that would be Ms. Glover's statement that Plaintiff is unable to cook like she used to

because she is not able to stand for an extended period of time.  However, this statement is

contradicted by the medical evidence.  There is no evidence that Plaintiff's ability to stand is

limited at all.  In fact, the consultative examination showed no sitting, standing, or walking

limitation.  As set forth above, if the lay testimony is controverted by the medical evidence, there

is no error in the ALJ ignoring the testimony.

The undersigned therefore determines the ALJ did not err in his treatment of the

lay witness testimony in this case.  The pain and numbness testimony was neither significant nor

1  probative, and the testimony regarding Plaintiff's ability to stand and cook is controverted by the

2  medical evidence.

3                **C.    Residual Functional Capacity**

4            Residual functional capacity is what a person "can still do despite [the

5  individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

6  Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

7  "physical and mental capabilities").  Thus, residual functional capacity describes a person's

8  exertional capabilities in light of his or her limitations.  A reviewing court "will affirm the ALJ's

9  determination of [the claimant's] RFC if the ALJ applied the proper legal standard and the

10 decision is supported by substantial evidence."  Bayless v. Barnhart, 427 F.3d 1211, 1217 (9th

11 Cir. 2005).

12           Plaintiff argues that the ALJ erred in rejecting her testimony, her lay witnesses'

13 testimony, and medical evidence, and therefore the RFC failed to include all of her limitations.

14 Defendant responds that there was no error

15           As discussed above, the ALJ did not err in rejecting Plaintiff's testimony, nor in

16 rejecting the third party testimony.  As such, there cannot be an error in failing to include in the

17 RFC the limitations properly rejected.  As to the rejection of medical evidence, Plaintiff fails to

18 adequately advocate her position.  While she claims the ALJ erred in his duty to develop, she

19 makes no argument that the ALJ improperly rejected some medical opinion.  The ALJ

20 determined Plaintiff retained the ability to stand and walk for six hours, sit for six hours, lift and

21 carry 25 pounds frequently and 40 pounds occasionally, and frequently reach above the shoulders

22 as well as frequent fine and gross motor movements.  These limitations are supported by the

23 record, and are based on the prior RFC ALJ Liggett findings as well as the consultative

24 examiner's determination as to Plaintiff's abilities.

25

26

1    As there was no error in the ALJ's rejection of the testimony, and the RFC is supported

2 by the evidence in the record, the undersigned cannot find any error in that determination nor in

3 the hypothetical presented to the VE.

4    Hypothetical questions posed to a vocational expert must set out all the

5 substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

6 Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

7 limitations, the expert's testimony as to jobs in the national economy the claimant can perform

8 has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

9 the ALJ may pose to the expert a range of hypothetical questions based on alternate

10 interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

11 determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

12 Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

13    Plaintiff contends the VE testified that if her limitations included the need for a

14 daily, unscheduled nap, she would be unable to perform any work in the national economy.  She

15 argues that she testified that due to her headaches, which occur once or twice a week, she has to

16 lie down for four hours in a quiet dark room.  However, as discussed above, the ALJ specifically

17 rejected her testimony regarding her headaches due to the lack of medical support.  The

18 undersigned agrees with that determination, in that there are only two instances the court could

19 find where Plaintiff complained about headaches.  As there was no error in discrediting that

20 testimony, there was no error in failing to include the restriction in the RFC or including it in the

21 hypothetical to the VE.  The hypothetical the ALJ relied on included all of the restrictions he

22 founds supported by the evidence.  Based on that hypothetical, the VE determined Plaintiff was

23 capable of performing her past relevant work.

24 / / /

25 / / /

26 / / /

Accordingly, the undersigned finds no error in the RFC determination, which is supported by substantial evidence, nor any error in the hypothetical the ALJ relied on.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

    1.    Plaintiff's motion for summary judgment (Doc. 25) is denied;

    2.    Defendant's cross-motion for summary judgment (Doc. 27) is granted; and

    3.    The Clerk of the Court is directed to enter judgment and close this file.


DATED: August 5, 2010


                                _____
                                **CRAIG M. KELLISON**
                                UNITED STATES MAGISTRATE JUDGE